[642 NYS2d 720]

In the Matter of STATE OF NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES, Petitioner, v PAULINE R. KINSELLA et al., Constituting the Public Employment Relations Board et al., Respondents. (Proceeding No. 1.)

In the Matter of CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO, Petitioner, v NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent. (Proceeding No. 2.)

Third Department, May 9, 1996

20

## APPEARANCES OF COUNSEL

*Dennis C. Vacco, Attorney-General,* Albany *(Lew A. Millenbach* of counsel), for Department of Correctional Services, petitioner.

*Nancy E. Hoffman,* Albany *(Jerome Lefkowitz* of counsel), for Civil Service Employees Association, petitioner.

*Gary Johnson,* Albany *(David P. Quinn* of counsel), for New York State Public Employment Relation Board, respondent.

*Hite & Casey, P. C.,* Albany *(Christopher H. Gardner* of counsel), for Council 82, respondent.

*Richard P. Casagrande,* Albany *(Jeffrey G. Plant* of counsel), for Public Employees Federation, respondent.

## OPINION OF THE COURT

CREW III, J.

In mid-1990, petitioner Department of Correctional Services (hereinafter DOCS) developed a program known as HUB, under the provisions of which correctional facilities in close geographic proximity to one another would be clustered under a single controlling administration. According to one of the architects of HUB, the program was designed to, *inter alia,* increase efficiency and improve the over-all management of the programs provided by those facilities. Later that year, DOCS also formulated a deficit reduction plan, which ultimately was to result in the consolidation or elimination of certain correction officer (hereinafter CO) posts. Following the

implementation of these programs in January 1991, the Oneida HUB was created, which included Mid-State, Marcy, Oneida and Mohawk Correctional Facilities.[1] A significant portion of the HUB plan involved the "civilianization" of certain CO positions and, insofar as is relevant to these proceedings, DOCS transferred responsibility for supervising the pavilion area at the Mid-State facility and supervising the utility crews at the Mid-State, Marcy, Oneida and Mohawk facilities from COs to civilians.[2]

In March 1991, respondent Council 82, AFSCME, AFL-CIO (hereinafter Council 82), representing the COs, filed an improper labor practice charge against DOCS, alleging that DOCS had refused to negotiate in good faith pursuant to the collective bargaining agreement in place between Council 82 and the State (*see*, Civil Service Law § 209-a [1] [d]) by virtue of its civilianization of certain CO posts. Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO (hereinafter CSEA) and respondent Public Employees Federation, AFL-CIO, representing the various civilian employees, subsequently were granted permission to intervene.

Following a lengthy hearing, at which numerous COs appeared and testified, the Administrative Law Judge (hereinafter ALJ) concluded, *inter alia*, that although DOCS had violated Civil Service Law § 209-a (1) (d) when it transferred responsibility for supervising the pavilion area at Mid-State from COs to civilians, its decision to civilianize the utility crews at Mid-State, Marcy, Oneida and Mohawk was within DOCS' "managerial prerogative" and was, therefore, permissible. Council 82, CSEA and DOCS thereafter filed various exceptions to the ALJ's decision.

In September 1994, respondent New York Public Employment Relations Board (hereinafter PERB) rendered a decision finding, *inter alia*, that both the civilianization of the utility crews and the transfer of the relevant pavilion supervisory duties violated Civil Service Law § 209-a (1) (d). As a result, DOCS was ordered to, *inter alia*, reestablish those positions at the relevant facilities and offer reinstatement with back pay

1. A fifth, yet to be completed facility is also slated to be included in the Oneida HUB.
2. The record indicates that the inmate utility crews at the affected facilities performed general maintenance duties, including trash collection, grounds work, snow shoveling and painting. The duties associated with supervising the pavilion at Mid-State entailed, *inter alia*, organizing the utility crews, distributing tools and equipment and providing security coverage.

and benefits to the COs who had been affected. Thereafter, in November 1994, DOCS and CSEA, respectively, commenced these proceedings pursuant to CPLR article 78 challenging PERB's decision and order with respect to these positions, and PERB counterclaimed for enforcement of its order. The proceedings were subsequently joined for trial, without consolidation, upon stipulation and transferred to this Court pursuant to CPLR 7804 (g).

Our review in these matters, which is limited to ascertaining whether PERB's determination is supported by substantial evidence in the record as a whole (see, Matter of Public Empls. Fedn. v New York State Pub. Empl. Relations Bd., 195 AD2d 930, 931, lv denied 82 NY2d 661; Matter of Board of Educ. v Public Empl. Relations Bd., 166 AD2d 587, 588), is guided by PERB's decision in Matter of Niagara Frontier Transp. Auth. (Niagara Frontier Transp. Auth. Pub. Officers Benevolent Assn.) (18 PERB ¶ 3083), which discusses the analysis to be employed in evaluating the propriety of a transfer of "unit work". As a threshold matter, it must be determined "whether the work [in question] had been performed by unit employees exclusively and whether the reassigned tasks are substantially similar to those previously performed by unit employees" (supra, at 3182). If both these inquiries are answered in the affirmative, the work transfer is deemed to be violative of Civil Service Law § 209-a (1) (d) unless the qualifications for the job at issue have changed significantly (see, supra). If such a change has in fact occurred, a balancing test is invoked and "the interests of the public employer and the unit employees, both individually and collectively, are weighed against each other" (supra, at 3182). With these principles in mind, we now address the matters before us.

Turning first to the propriety of DOCS' decision to transfer responsibility for supervising the pavilion area at Mid-State from COs to civilians, Anthony Farda, the correction officer who formerly held that post, testified that prior to the transfer of duties COs exclusively performed the tasks associated with that position. Following the implementation of HUB, Farda apparently was replaced by a civilian grounds supervisor, Walter Kirk. Although DOCS is correct in noting that civilian grounds personnel in general, and Kirk in particular, had greater responsibilities than their CO counterparts, two important points bear mention. First, as PERB's decision in Matter of Niagara Frontier Transp. Auth. (supra) makes clear, the duties performed by Farda and Kirk need not be identi-

cal—substantial similarity is all that is required. In this regard, the respective job descriptions contained in the record indicate that both Farda and Kirk were responsible for, *inter alia*, generally supervising the inmates assigned to the utility work crews, ensuring the proper use of tools and equipment, maintaining written reports regarding inventory and evaluating the inmates' work performance.[3] As such, we cannot say that PERB erred in finding that their tasks were substantially similar. With respect to whether DOCS significantly altered the qualifications required for that position, there can be little doubt that permitting civilians to perform tasks previously undertaken exclusively by COs constitutes a substantial change in job qualifications.

As to the application of the balancing test, PERB's conclusion that the COs' employment interests should prevail here is supported by the record. In this regard, although DOCS contends that civilians are better suited to supervising the pavilion area, PERB found, and DOCS concedes, that there is no direct evidence that DOCS was aware of any particular problems associated with COs supervising the pavilion at the time of the transfer or that it made the transfer of duties based upon a belief that civilians could provide better service in this area.[4] Accordingly, PERB's determination with respect to the supervision of the pavilion area at Mid-State must be confirmed.

We reach a similar conclusion with respect to the civilianization of the utility crews. At the hearing conducted in this matter, numerous COs testified that prior to the transfer in duties COs exclusively supervised the inmate utility crews and performed all tasks associated therewith.[5] The record also reveals, both through the testimony of various COs and

---

**3.** Although Kirk indeed acquired greater responsibilities following the transfer of duties, we cannot say that the record fails to support PERB's conclusion that this was due in large measure to the fact that Kirk supervised both the grounds and vocational programs at the facility.

**4.** The mere fact that experience may have proven this to be true cannot provide retroactive support for DOCS' position.

**5.** In this regard, although both DOCS and CSEA argue that supervision of the inmate utility crews was not exclusively a CO function because certain inmates were supervised by civilians prior to the implementation of HUB, PERB appropriately found that there were discernible differences between the level and type of supervision provided to the inmates enrolled in the vocational program and to the inmates assigned to utility crews. The inmate utility crews were comprised of 8 to 10 inmates who performed routine and unskilled maintenance tasks, and the COs formerly assigned to them primarily provided a security function. The inmates enrolled in the vocational

documentary evidence, that the civilian groundskeepers performed substantially the same tasks following the reassignment of duties as the COs performed prior thereto. Further, as was the case with the pavilion supervisory position, permitting civilians to perform tasks previously assigned exclusively to COs represents a significant change in job qualifications.

As to the application of the balancing test, we cannot say that PERB's determination that the COs' employment interests outweighed DOCS' economic considerations is not supported by substantial evidence. In this regard, it must be remembered that "[i]t is the duty of the administrative agency and not the court to weigh the evidence and resolve conflicting testimony" (*Matter of New York City Tr. Auth. [New York State Pub. Empl. Relations Bd.]*, 154 AD2d 680). Additionally, it is well settled that a determination may be supported by substantial evidence in the record even if other evidence would support a contrary conclusion (*see, Matter of Kornblum v Tax Appeals Tribunal*, 194 AD2d 882, 883; *Matter of Kurzyna v Communicar, Inc.*, 182 AD2d 924, *lv denied* 80 NY2d 754).

In support of its claim that PERB erred in failing to conclude that the State's economic and managerial interests overrode the employment interests of the COs, DOCS argues that (1) the record demonstrates that the civilians were indeed more efficient than their CO counterparts, (2) the determination to civilianize certain positions was based upon a conscious decision to reduce the level of security needed within the perimeter of the affected facilities, and (3) any layoffs were due solely to the implementation of the deficit reduction plan and, further, that unless such layoffs were involuntary, the COs can claim no detriment. The record before us, however, supports PERB's rejection of each of these arguments.

As PERB appropriately recognized, the mere fact that the utility crews may have performed better with civilian supervisors after the implementation of HUB cannot justify DOCS' decision to eliminate those CO positions in the first instance. Additionally, with respect to facility security, while it is true that Edward Reynolds, the supervising superintendent of the

---

program, on the other hand, represented a skilled labor force (plumbers, electricians, etc.), and the civilian instructors worked with these inmates in small groups and provided hands-on training. Additionally, although the record demonstrates that all DOCS employees are responsible for security in the broad sense, the vocational instructors, unlike the COs, were not primarily responsible for providing security for the inmates in their charge. Accordingly, we see no basis for disturbing PERB's findings as to the exclusivity of these positions.

Oneida HUB, testified that a decision was made to decrease security within the facilities' respective perimeters and, as such, the level of security formerly provided by the COs was no longer required, the record is replete with evidence that the civilian groundskeepers nevertheless were required to maintain control over their inmate utility crews and had the authority to issue disciplinary tickets if necessary. Thus, while it is readily apparent that civilian personnel, who admittedly did not possess the same degree of training as the COs, provided a different *level* of security, PERB's conclusion that the civilians still provided a necessary security function is supported by the record as a whole.

Finally, as to the issue of layoffs, DOCS' argument that PERB erred in concluding that the COs suffered a detriment attributable to HUB's implementation is flawed in at least two respects. First, although HUB and the deficit reduction plan indeed were formulated separately, the record indicates that both programs were implemented at the same time and there is evidence to support a finding that they were interrelated to some extent. Notably, the HUB implementation plan for Mid-State reflects that the HUB concept was "intended to increase efficiency and minimize costs by sharing services and staff whereever [*sic*] possible "and makes specific mention of replacing COs with civilians in an effort to reduce over-all expenses. Although Reynolds and Joseph Murphy, DOCS' director of human resources management, steadfastly maintained that any loss of CO positions was solely the result of the deficit reduction plan, it was for PERB to evaluate their credibility and weigh the conflicting evidence on this issue (*see, Matter of New York City Tr. Auth. [New York State Pub. Empl. Relations Bd.]*, 154 AD2d 680, *supra*).

Moreover, even accepting that no involuntary layoffs occurred as a result of HUB, the record makes clear that a significant number of CO posts were in fact eliminated which, PERB reasonably could conclude, diminished the over-all negotiating power of the unit. Additionally, even assuming that all of the affected COs successfully located a different position at the same salary, the record plainly indicates that numerous COs nevertheless suffered an impairment of the terms and conditions of their employment by having to work different shifts or have less desirable days off. Accordingly, we cannot say that PERB erred in concluding that the affected COs suffered a detriment as the result of the implementation of HUB and, further, that the COs' employment interests outweighed DOCS' economic interests in this respect.

In view of the foregoing, the respective petitions are dismissed and PERB's counterclaim for enforcement of its determination and order is granted (*see*, Civil Service Law § 205 [5] [d]; § 213 [d]). Petitioners' remaining arguments have been examined and found to be lacking in merit.

MIKOLL, J. P., MERCURE, YESAWICH JR. and SPAIN, JJ., concur.

Adjudged that the determination is confirmed, without costs, petitions dismissed and respondent Public Employment Relations Board's counterclaim for enforcement of its determination and order is granted.